IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiffs,<br><br>v.<br><br>FU-TAIN LU,<br><br>    Defendant. | Case No. C-09-00341-RMW<br><br>FINDINGS ON DISPUTED FACTUAL ISSUES FOR SENTENCING |

**A.**

Defendant Fu-Tain Lu ("F.T. Lu") entered a plea of guilty to Count Two of the Superseding Indictment charging him with wilfully exporting a Miteq microwave amplifier from the United States to the People's Republic of China ("PRC") without having first obtained a required export license from the Department of Commerce. The parties have agreed that the adjusted offense level under the United States Sentencing Guidelines is 23 assuming the defendant meets the requirements for acceptance of responsibility under USSG §3E1. However, the parties dispute whether certain disputed facts should be considered by the court as either relevant conduct (USSG §1B.3) or other information that may be used in determining an appropriate sentence (18 U.S.C. § 3661; U.S.S.G. §1B1.4) or should not be considered at all.

On May 30, 2012 the court held an evidentiary hearing to resolve disputed factual issues relevant to sentencing. The parties agreed at the hearing that the issues listed in the Government's Statement of Disputed Issues for Evidentiary Hearing filed May 15, 2012 (Docket # 153) lists the factual issues in dispute and that items 1 and 7 on the list raise the same issue. Testimony was given by Special Agent Mike Zaborowski from the Office of Export Enforcement of the Department of Commerce and by Tommy Lu, the defendant's son. After considering the testimony, the evidence offered and the arguments of counsel, the court hereby makes its findings on each of the disputed issues. The court follows the numbering and titles used by the Government in its list of disputed issues.

**B.**

**1.      Fu-Tain Lu's Relationship with Everjet and Initial Denial of that Relationship**

Defendant F.T. Lu owned Fushine Technology Inc. ("Fushine"), a California company that exported items to Taiwan and the PRC. The Government contends that F.T. Lu also owned and founded Everjet Science & Technology ("Everjet") located in Shenzhen, China and that it was essentially his alter ego. Everjet allegedly assisted F.T. Lu in exporting microwave amplifiers to the PRC. The Government contends that F.T. Lu originally told Agent Zaborowski when Fushine's premises were searched on November 22, 2006 that he only acted as a consultant to Everjet and could not remember who owned it. However, Agent Zaborowski stated that after he confronted F.T. Lu with some documents suggesting he had a closer connection with Everjet, he admitted he founded the company and ran it. Tommy Lu acknowledged in his testimony that his father owned and ran Everjet. The Miteq Sales Representative Agreement entered into by Fushine, Field Technologies and Everjet on September 29, 2005 lists the address of all three as 18730 Hanna Drive, Cupertino, California, F.T. Lu's residence and Fushine's place of business. It is signed by F.T. Lu as "President." Def.'s Ex. A. Other documents seized from F.T. Lu's premises show that he owned Everjet. *See* Govt.'s Exs. 1-5.

F.T. Lu does not currently deny that he owned Everjet, and he admits in his plea agreement

that Fushine exported a microwave amplifier to Everjet in the PRC without a required license or license exception from the Department of Commerce.  Although F.T. Lu has not expressly admitted that he initially lied to Agent Zaborowski about his ownership of Everjet, he has offered no evidence disputing Agent Zaborowski's testimony.  Also, F.T. Lu did have a motive to minimize his involvement with, and his control of, Everjet because it was located in the PRC and had, at least according to its Website, military research institutes as customers.  In summary, the evidence establishes that F.T. Lu controlled Everjet and that he initially tried to distance himself to avoid providing information about Everjet's activities to Agent Zaborowski.

### 2. The April 21, 2003 Email ("These products are a little bit sensitive")

The parties disagree as to the meaning and significance of the following email, sent by an Everjet employee to Fushine on April 23, 2003:

> Dear [Rosa Zheng], Since these products are a little bit sensitive, in case the maker ask you where the location of the end user is, please do not mention it is China.  Thank you!

Govt.'s Ex. 6.  F.T. Lu asserts that the Government interprets this email out of context.  He argues that the reference to the products being "sensitive" in the context of the email exchange in which the language was used dealt with getting a price quote which depended on the destination of the product.  He further points out that he personally was not involved in the email exchange and did not fill out the end-user statement.  Once the quote had been obtained, the manufacturer (Rogers Corporation) was provided with an end-user statement showing that the end-user was Beijing Zhangtian Broadcast and Television company, a company in the PRC.  *See* Def.'s Ex. B.  The Government did offer documents obtained from Fushine that could be read to show that the true end user was "Beijing Changzheng [Long March] Yutong Monitoring and Control Communication Technology Limited Liability Company," whose products are aviation antennas, base station antennas, common frequency transmitters - in other words, not a television company.  *See* Govt.'s Exs 6-9.  However, the court finds the Government's argument that "a little bit sensitive" refers to export controls and not pricing is speculative and should not be considered as evidence that F.T. Lu was knowingly

trying to hide the true end user or the nature of the end user to avoid export controls.

### 3. June 28, 2004 "Demonstration Models"

On June 28, 2004, F.T. Lu told Special Agent Zaborowski that the amplifiers he was hand carrying to Taiwan were "demonstration models" that he would be bringing back to the United States. Everjet's purchase order describes the shipping method as "FT Hand Carry" (Govt. Ex. 11) and no record was found at Fushine showing that these amplifiers were returned to Miteq. There is a record suggesting that the amplifiers were paid for, although the date of delivery reflected seems wrong. *See* Govt.'s Ex. 13. In any event, the "demonstration models" designation appears to have been given to avoid export controls and not because the amplifiers were actually "demonstration models."

### 4. FT Told Zaborowski that Miteq Was Responsible for Obtaining Export Licenses

During Agent Zaborowski's interview with F.T. Lu on June 28, 2004, he told Agent Zaborowski that Miteq was supposed to apply for licenses on Fushine's behalf on product Fushine obtained from Miteq and exported to the PRC. David Krautheimer, an assistant to Miteq's president, provided a declaration in which he denies that Miteq agreed to apply for United States export licenses on behalf of Fushine.[1] To the contrary, he asserts that Miteq gave training to F.T. Lu on license requirements to educate him on Fushine's responsibilities. An email from Rosa Zheng, a Fushine employee, to F.T. Lu corroborates that licensing responsibility was Fushine's:

> For your information, in my telephone conversation with David Krautheimer and John Pastore on Thursday Feb 19, 2004. I was told by both of them: "that it is the responsibility of Fushine Technology to determine for any items that may require export license before shipping them out of USA. That is not their job to notify Fushine Technology as it located in USA". [*sic*].

Govt. Ex. 16. Tommy Lu who worked for Fushine from approximately 2005 to "a few years ago" also acknowledged that Fushine had the responsibility to get needed export licenses but explained

---

[1] Defendant objected to portions of the declaration on the basis that the declaration constituted hearsay. However, he agreed that paragraphs 1-3 could be considered and paragraph 3 explained that Miteq did not agree to apply for export licenses on behalf of Fushine.

Case No. CR-09-00341-RMW 4

that he asked Miteq for help in determining whether commodities required licenses. He said he was responsible on behalf of Fushine to obtain end user information and he got that information from Roy Wang at Everjet. Tommy Lu denied that he obtained end user information from his father or that his father ever suggested to him ways to avoid export requirements. In F.T. Lu's Second Supplemental Sentencing Memorandum, F.T. Lu acknowledged that Fushine was supposed to obtain needed export licenses:

> In practice, however, Miteq treated Fushine as a reseller of product and thereby transferred to Fushine the responsibility for complying with export regulations. Admittedly, F.T. Lu and Fushine did not handle this responsibility as well as they probably should have.

Def.'s Sec. Supp. Sent. Memo 3:21-24.

The evidence is convincing that as of June 28, 2004 Fushine had the obligation to obtain any required license and that F.T. Lu when interviewed by Agent Zaborowski in June initially attempted to avoid responsibility for failing to do so by telling Agent Zaborowski that Miteq had the responsibility for obtaining any required license. However, the evidence also suggests that Tommy Lu relied on Miteq for assistance in determining whether a license was required and that he got his end user information from Wang. Defendant asserts that "[p]rior to 2004 F.T. Lu was not required to provide end user information to Miteq and was unaware that any of the parts referred to in the purchase orders set forth in Table 1 (Govt. Ex. 27) to the Government's Sentencing Memorandum required a license for export to China. As far as F.T. Lu was aware, these were commercial parts for commercial uses as he had been told by David Krautheimer." Def.'s Sec. Supp. Sent. Memo 3:12-16. Ths assertion is not backed up by admissible evidence.

### 5. **F.T. Lu Told Zaborowski He Knew Nothing About Junsdom**

The Government contends that on December 12, 2005 F.T. Lu falsely represented to law enforcement (Zaborowski) that: (1) Junsdom was the intended end user of certain Miteq amplifiers that had been seized on August 11, 2005 by Customs and Border Patrol when Fushine attempted to ship them to the PRC and (2) that he did not know anything about the ownership and business of

Junsdom, the purported end user. These allegedly false statements are charged in Counts Four and Five of the Superseding Indictment to which F.T. Lu pled not guilty. F.T. Lu denies he made the statements. The Government introduced what according to Agent Zaborowski is a price quote from Everjet to the 14th Research Institute (the document is in Chinese but Zaborowski testified he had it translated) for the amplifiers seized on August 11, 2005. Govt. Ex. 18. The Government also introduced a purchase order from Everjet to Fushine for the amplifiers and a purchase order from Fushine to Miteq for those same amplifiers. Govt. Exs. 18 & 19. Agent Zaborowski testified that in his interview with F.T. Lu on December 12, 2005 F.T. Lu said Junsdom was the end user and that he was unfamiliar with Junsdom's business or ownership. However, F.T. Lu's sister and nephew founded Junsdom and F.T. Lu had written a memo on June 1, 2005 to "All Everjet Sales and Employees" about Junsdom's business and its relationship to Everjet. Govt. Ex. 17. The Government submits that F.T. Lu was trying to hide the fact that the 14th Research Institute was the actual end user during the interview on December 12, 2005.

F.T. Lu clearly knew who owned Junsdom and the nature of its business. However, as discussed below, it is not apparent why he was not candid with Agent Zaborowski.

### 6. **FT Falsely Denies Familiarity with the 14th Research Institute**

In the December 12, 2005 interview, Agent Zaborowski asserts that F.T. Lu told him that he was unfamiliar with any military research institutes in the PRC and, in particular, that he was not familiar with the 14th Research Institute (also know as the Nanjing Research Institute of Electronics, or NRIET) in Beijing. To prove that this statement was false, the Government introduced an email dated April 4, 1995 in which F.T. Lu acknowledged having worked with the NRIET/14th Research Institute, as well as testimony from Special Agent Zaborowski that the 14th Institute was known to be involved in both civilian and military activities. The Government submits that a reasonable inference from F.T. Lu's denial is that he was trying to hide Fushine's exports for military applications. However, it seems odd that F.T. Lu would have denied familiarity with Institute 14 since he had substantial business with the 14th Institute in Fushine's capacity as a representative of

1  Miteq.  Whether Agent Zaborowski misunderstood F.T. Lu or whether F.T. Lu thought Agent
2  Zaborowski was asking about exports for military purposes or whether F.T. Lu's denial was the
3  result of general obstinance or some other reason, the court does not find that a preponderance of the
4  evidence supports an inference that F.T. Lu had the intent to hide shipments that were made for
5  military purposes.

**7.   FFT Falsely Claims He Cannot Remember the Name of Everjet's Owner**

*See* 1 above.

**8.   F.T. Lu Falsely Claims Never to Have Heard of the 3rd Research Institute**

Special Agent Zaborowski says that, at the search warrant execution at Fushine's premises on November 22, 2006, F.T. Lu claimed that he had never heard of the 3rd Research Institute, nor done any business with it.  The Government offered two documents found at the search of the Fushine premises that show that what F.T. Lu allegedly said is not true: (1) a contact list reflecting the Beijing office of Everjet being located at the Eclectro 3rd, Information Industry Military (*sic*) in Beijing (Govt. Ex. 24); and (2) an Announcement dated October 18, 2004 reflecting F.T. Lu as the author stating that "[t]he Beijing office [of Everjet] moves out from our joined partner, The 3rd Institute of Electronic Department." Govt. Ex. 25.  As with F.T. Lu's denial of knowledge of Institute 14, the evidence in not sufficient to allow the court to reach a conclusion as to why F.T. Lu denied knowledge of the 3rd Research Institute.

**9.   Military Customers in Table 1**

The government introduced Table 1 (Govt. Ex. 27) which has three columns.  The first two columns list Fushine orders placed in 1993 and the end-users for those orders.  The information was apparently obtained by Agent Zoborowski from information taken off of a Fushine computer at the time of the search of Fushine's premises.  The third column is a list of military activities of the end-users compiled by Agent Zoborowski from various sources. The Government offered little evidence as to the reliability of those sources beyond Agent Zoborowski's opinion.  There was also no direct evidence that any of the shipments were for military purposes, although given the nature of the end

Case No. CR-09-00341-RMW              7

1 | users export licenses were required but not obtained.

2 |     The defense contends that "[p]rior to 2004, F. T. Lu was not required to provide end user
3 | information to Miteq and was unaware that any of the parts referred to in the purchase orders set
4 | forth in Table 1 to the Government's Sentencing memorandum required a license for export to
5 | China. As far as F.T. Lu was aware, these were commercial parts for commercial uses as he had
6 | been told by David Krautheimer." Def.'s Sec. Supp. Sent. Memo 3:13-16. This contention,
7 | however, is not supported by evidence. It is attorney argument.

8 |     Given the sparse evidence concerning the exports listed in Table 1, the court cannot conclude
9 | that these shipments were for military purposes. It seems unlikely that Miteq, which undoubtedly
10 | had knowledge of the customers for orders it filled, would have filled any orders for any amplifiers
11 | knowing that they would be used for military purposes. On the other hand, it also seems unlike that
12 | F.T. Lu did not know that at least some of these exports required licenses.

**10. "Commercial Fish Finders"**

    The defense's Second Supplemental Sentencing Memorandum says that Hongtu's general manager represented to Miteq's David Krautheimer and F.T. Lu that Miteq's amplifiers were used for commercial fish finding. In addition, the defense said Krautheimer told F.T. Lu that the parts being sold to Hongtu were "off the shelf" commercial amplifiers. The Government contends that Krautheimer did not make such representations and originally sought to introduce a declaration from Krautheimer (Govt. Ex. 15) to that effect and a letter from Wang (Govt. Ex. 28) to impeach the alleged representations. Since the defense objected to the declaration from Krautheimer because he was not available for cross-examination and the court expressed similar concern, the parties stipulated that the defense would withdraw its claim as to what Krautheimer said and the Government would not seek to offer the applicable paragraphs of Krautheimer's declaration. The court finds that nothing in paragraph 10 of the Statement of Disputed Issues for Evidentiary Hearing will be considered in connection with sentencing.

///

**11. Post-Indictment Shipment to JEC**

The Government contends that Fushine falsely stated that the end user for a shipment of amplifiers seized by Customs and Border Protection on March 24, 2012 was Jiangnan Electronic Communications Research Institute ("JEC") and not, as Fushine's paperwork claimed, Shenzhen Sheyuyan Company, Ltd., a Chinese trading company. Tommy Lu, a very defensive witness, testified he filled out the export declaration and obtained the end user information from Wang at Everjet and that his father had nothing to do with the shipment. He claims he still believes that Shenzhen Sheyuyan Company was the end user. Although he has seen a document stating that the end user was JEC he claims that Wang told him that was a mistake. Tommy's testimony was not credible in large part but the only evidence tying F.T. Lu to the failure to properly identify the end user is the fact that he controlled Everjet and Fushine. However, Tommy, based upon information supplied by Wang and possibly Miteq, handled the paper work for the export. The defense also points out that at the same time this shipment was occurring, Fushine was shipping an identical part to JEC and the shipper's declaration showed JEC as the ultimate consignee. No explanation is given for why F.T. Lu would attempt to hide the fact that a shipment was destined for JEC while at the same time openly ship an identical part to JEC. The fact that F.T. Lu at one point apparently told his lawyers that he did not believe that Fushine ever received an order from JEC is difficult to explain, although it may suggest that F. T. Lu had a habit of at least initially denying anything that he feared might get him in trouble and only admitted the truth when directly confronted with evidence that he could not deny.

DATED: October 26, 2012

_____
RONALD M. WHYTE
United States District Judge

Case No. CR-09-00341-RMW           9